# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### STATESVILLE DIVISION
### 5:18-cv-00181-MR

GREGORY H. JONES,⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
vs.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀**MEMORANDUM OF**
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀**DECISION AND ORDER**
JEFFREY E. RICKMAN, et al.,⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀Defendants.⠀⠀⠀⠀)
_____ )

**THIS MATTER** comes before the Court on the following:

(1)⠀⠀Plaintiff's Motion for Summary Judgment [Doc. 74];

(2)⠀⠀Defendants Belinda E. Abreu-Pena, James Clare,[1] Jeffrey E. Rickman, and Donna L. Woodruff's Motion for Summary Judgment [Doc. 80];

(3)⠀⠀Defendant FNU (Tim F.) Townsend's[2] Motion for Summary Judgment [Doc. 88]; and

(4)⠀⠀Defendants Erik Hooks, Kenneth Lassiter, Dora Plummer, and Paula Smith-Sawyer's Motion for Summary Judgment [Doc. 91].

_____

[1] The Clerk will be instructed to correct the spelling of Defendant Claire to Clare in the docket in this matter.

[2] The Clerk will be instructed to substitute the true full name of Defendant FNU Townsend to Tim F. Townsend in the docket in this matter.

## I.    PROCEDURAL BACKGROUND

Pro se Plaintiff Gregory H. Jones ("Plaintiff") is a North Carolina inmate currently incarcerated at Pender Correctional Institution in Burgaw, North Carolina.  Plaintiff filed this action on November 13, 2018, pursuant to 42 U.S.C. § 1983, naming no less than twenty-three Defendants and alleging various claims arising out of unrelated events occurring during his incarceration at Alexander Correctional Institution ("Alexander") and Mountain View Correctional Institution ("Mountain View").  [Doc. 1].  On initial review of Plaintiff's Complaint under 28 U.S.C. §§ 1915(e)(2) and 1915A, the Court found that Plaintiff had asserted wholly unrelated claims against the different Defendants and allowed Plaintiff 30 days to amend his Complaint to comply with Rules 18 and 20 of the Federal Rules of Civil Procedure. [Doc. 11 at 3-6].

Plaintiff timely filed a verified Amended Complaint, with numerous exhibits, naming as Defendants Jeffrey E. Rickman, Tim F. Townsend, and Belinda E. Abreu-Pena, all identified as dentists employed by the North Carolina Department of Public Safety (NCDPS); and Defendant Erik Hooks, identified as the Secretary of the NCDPS.  [Doc. 16; see id. at 9, 63].  Plaintiff claimed these Defendants violated his Eighth Amendment rights by their deliberate indifference to Plaintiff's serious medical needs.  Specifically,

Plaintiff alleged that between December 2016 and November 2018, while incarcerated at Mountain View and Alexander, he was denied necessary dental care by Defendants Rickman, Townsend, and Abreu-Pena pursuant to NCDPS policy, adopted by Defendant Hooks, which provides for long outdated and inadequate medical care. [Doc. 16 at 15-16; Doc. 16-1 at 1-3]. Plaintiff also described conduct by "policymakers" Kenneth Lassiter, Christopher Murray, Paula Smith, Dora Plummer, James Clare, and Donna L. Woodruff, but Plaintiff failed to name them as Defendants in his Amended Complaint. [See Doc. 16 at 2-3, 15].

The Court allowed Plaintiff's claims again Defendants Rickman, Townsend, Abreu-Pena, and Hooks to proceed on initial review and advised Plaintiff that if he intended to name the "policymakers" as Defendants, then he must file a motion to add them as Defendants. [Doc. 17]. Plaintiff promptly moved to add Lassiter, Smith, Plummer, Clare, and Woodruff (but not Murray) as Defendants in this matter. [Doc. 21]. The Court granted Plaintiff's motion [Doc. 22] and the matter proceeded against these Defendants as well. Plaintiff seeks injunctive and monetary relief. [Doc. 16 at 5; Doc. 16-1 at 7-8].

On October 16, 2019, counsel from the North Carolina Prisoner Legal Services (NCPLS) was appointed to assist Plaintiff in conducting discovery

in this matter.  [Doc. 56].  NCPLS counsel filed a notice of appearance on Plaintiff's behalf shortly thereafter.  [Doc. 57].  Less than two months later, Plaintiff's NCPLS counsel moved to withdraw as his attorney.  [Doc. 67].  In her motion, NCPLS counsel cited Plaintiff's assertion that she "[did] not represent [him]," that Plaintiff had claimed she had denied Plaintiff assistance, and that Plaintiff had indicated that he would conduct his own discovery.  [Id.].  The Court granted NCPLS counsel's motion [Doc. 70] and Plaintiff again proceeded entirely pro se.

The parties have all moved for summary judgment.[3]  [Docs. 74, 80, 88, 91].  After all Defendants moved for summary judgment, the Court entered an order in accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing a response to the summary judgment motions and of the manner in which evidence could be submitted to the Court.  [Doc. 94].  The Plaintiff was specifically advised that he "may not rely upon mere allegations or denials of allegations in his pleadings to defeat a summary judgment motion."  [Id. at 2].  Rather, he must

---

[3] Plaintiff's motion for summary judgment is nothing more than another recitation of facts Plaintiff contends support his claims against Defendants, together with citation to legal authority primarily from other circuits.  [See Doc. 74].  Plaintiff presents nothing by way of affidavit or under penalty of perjury and no additional documents in support of his claims. As such, the Court does not separately consider Plaintiff's motion for summary judgment and, instead, relies on Plaintiff's verified Amended Complaint, including exhibits, in determining whether summary judgment is appropriate for any party, as discussed more fully below.

4

support his assertion that a fact is genuinely disputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." [Id. at 3 (citing Fed. R. Civ. P. 56(c)(1)(a)]. The Court further advised that, "[i]f Plaintiff has any evidence to offer to show that there is a genuine issue for trial," "he must now present it to this Court in a form which would otherwise be admissible at trial, i.e., in the form of affidavits or unsworn declarations." [Id. at 2 (citing Fed. R. Civ. P. 56(c)(4))]. Plaintiff timely responded to Defendants' motions, although his response included only ten handwritten pages of factual allegations that are redundant of those in his Amended Complaint, which were not made by affidavit or under penalty of perjury. [See Doc. 96].

This matter is now ripe for adjudication.

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986).  A fact is material only if it might affect the outcome of the suit under governing law.  Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party.  The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  Id. at 322 n.3.  The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment.  Id. at 324.  Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" in the record.  See id.; Fed. R. Civ. P. 56(c)(1)(a).  Namely, the nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th

Cir. 1995).  A verified complaint, like Plaintiff's Amended Complaint, however, "is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge."  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party.  Anderson, 477 U.S. at 255.  "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'"  Ricci v. DeStefano, 129 S. Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  "[I]n determining whether a prisoner has received adequate medical treatment, the federal court is entitled to rely on the physician's affidavit and prison medical records kept in the ordinary course of operation."  Stokes v. Hurdle, 393 F. Supp. 757, 762-63 (4th Cir. 1975), affirmed, 535 F.2d 1250 (4th Cir. 1976) (citations omitted).  "In short, if it appears from the record that the prison medical authorities have made a sincere and reasonable effort to handle the prisoner's medical problems, the constitutional requirements have been met."  Id. at 763.

## III.    FACTUAL BACKGROUND

### A.    Plaintiff's Allegations and Forecast of Evidence[4]

Plaintiff alleges that Defendants Rickman, Abreu-Pena, and Townsend "refused to fill [his] upper canine tooth (#11) since Dec/2016 unless [he] let them extract [his] 3 remaining upper teeth and wait 12-18 months for a top denture."  [Doc. 16 at 12].  Plaintiff further complains that "[one] of the teeth they want[ed] to pull is a good crown [he] paid for in 1975 before prison."  [Id.].  Plaintiff alleges that these dentists' "refusal to repair" Plaintiff's tooth for two and a half years "caused pieces to break off and it [to] abscess, so it had to be pulled in May/2019."  [Id. at 13].

Plaintiff alleges that in December 2016 Dr. Townsend refused to fill or repair Plaintiff's "upper canine when the filling fell out" and would only consider "pulling out all [Plaintiff's] top teeth and requesting a full top denture."  [Doc. 16-1 at 3].  Plaintiff further alleges that Dr. Townsend told him that it would take approximately one year to get the full denture and that

_____

[4] Plaintiff's allegations are taken from Plaintiff's verified Amended Complaint and Exhibits thereto.  As noted, they are equivalent to an opposing affidavit for summary judgment purposes.  The exhibits to Plaintiff's Amended Complaint include Plaintiff's "Supporting Affidavit," certain Sick Call Appointment Requests, a letter written by Plaintiff to Defendant Smith, grievance records related to Plaintiff's dental care, a "grievance" sent directly to Defendant Lassiter, an article from Prison Legal News magazine, and two miscellaneous letters by Plaintiff.  [See Doc. 16-1].  As such, Plaintiff's allegations, as recited by the Court here, will be considered relative to Defendants' forecast of evidence, presented below.

when Plaintiff asked Dr. Townsend how Plaintiff would chew with no top teeth, Dr. Townsend responded, "You'll figure something out." [Id.].

Plaintiff further alleges that he was transferred to Alexander on June 19, 2018 and that his "[two] front teeth broke a few days later." [Doc. 16-1 at 1]. Plaintiff alleges that he completed a Sick Call Appointment Request, but he was denied dental treatment. [Id.]. Plaintiff alleges that he filed two more requests for an appointment, but was "still ignored, so [he] filed a grievance." [Id.]. Plaintiff alleges that he then filed "an emergency sick call just to have Dentist Abreu mail [his] denture to Raleigh for repair." [Id.]. Plaintiff further alleges that his partial plate broke four times in 2017 and once in 2018 and that a full denture "would be made of the same breakable plastic." [Id.].

Plaintiff alleges that he saw Dr. Rickman on August 2, 2018, that Dr. Rickman "refused to fix the broken partial, [Plaintiff's] upper canine, or anything else" and "suggested extraction of all my top teeth, including a good crown [Plaintiff] bought in 1975," for a full upper denture, which Plaintiff alleges "would take a year or more." [Id.]. Plaintiff also alleges that Dr. Rickman "denied [Plaintiff] treatment for a broken partial almost 3 months." [Id.]. Plaintiff claims that he "had to wait 2 more months, filing sick calls, a grievance, and an emergency sick call just to have [his] partial sent to Raleigh." [Id. at 2].

9

Plaintiff alleges that Dr. Abreu-Pena "mailed [Plaintiff's] partial in, but refused to treat [his] dental problems." [Id.]. Plaintiff further alleges that Dr. Abreu-Pena told him that his partial denture was dated 2017, so Plaintiff may have to wait five years from 2017 to have a new denture made. [Id.].

On March 19, 2018, Plaintiff wrote a letter to Defendant Paula Smith, M.D., in her capacity as Medical Director, complaining about the dental care he was receiving. [Id. at 15-22]. He wrote, "I only have 4 top teeth left. One is a crown done in 1975 before my arrest. My partial plate attaches to it and my canine which has a hole in it the dentist refuses to fill. He wants to pull all my top teeth and have me wait about a year for an upper denture." [Id. at 15]. Plaintiff further stated that he "[has] been in prison since 1975 and denied treatment that would have saved my teeth…" [Id.]. Plaintiff then cited extensively to various policies and case law he believed were being violated and/or supported the treatment he was seeking. [Id. at 15-21]. Plaintiff concluded his letter by asking whether he would need to file a lawsuit to get "[his] teeth fixed." [Id. at 21-22].

Defendant Donna Woodruff, Assistant Dental Director, responded to Plaintiff's letter on April 30, 2018. [Id. at 23]. In her response, Dr. Woodruff stated, in part, as follows:

> After reviewing [your] records and speaking with the
> dental staff, I see where you have had dental

appointments to address concerns with your teeth on February 21, 2018 and March 18, 2018. Your dental condition has been explained to you and treatment options offered. An upper denture is a reasonable treatment option for you. NCDPS does not provide routine crowns, bridges or implants. You are not in minimum custody and do not qualify to be considered for outside services at this time.

[Id. at 23]. Dr. Woodruff then advised Plaintiff, "[y]ou are receiving active dental care. Please continue to follow-up with your unit dentist." [Id.].

Plaintiff alleges that Defendant Lassiter, the NCDPS Director of Prisons from May 2017 to September 2019, "has been in the prison system for many years" and "could have changed[d] unconstitutional medical and dental policies if he wanted to." [Doc. 16 at 16]. On May 13, 2018, presumably after having received Dr. Woodruff's response, Plaintiff sent a letter to Defendant Lassiter. Although this letter was written on a grievance form and Plaintiff calls it a "grievance," Plaintiff alleges that he sent it directly to Defendant Lassiter. [Doc. 16-1 at 24-28; Doc. 16 at 22]. Further, there is no forecast of evidence suggesting that it was filed as a grievance. In this letter, Plaintiff again complains about his dental care and certain dental policies. Plaintiff concluded his letter by stating, "Fix my teeth, or let me get an outside dentist to do it." [See Doc. 16-1 at 28]. Plaintiff alleges that Defendant Lassiter "refused to answer" this letter, [Doc. 16 at 22], although there is no forecast of evidence that Defendant Lassiter ever received the

letter. Plaintiff also alleges that he sent a "follow-up grievance" to Lassiter about Lassiter's refusal to answer.[5] [Id. at 16]. Plaintiff contends that Defendant Lassiter's conduct constitutes deliberate indifference to prisoner dental needs. [Id. at 17]. Plaintiff also asserts that Lassiter's "policies resulted in the loss of most of [Plaintiff's] teeth since [Plaintiff] came to prison." [Doc. 16-1 at 4].

On September 7, 2018, Plaintiff filed a grievance, complaining that "[his] 2 front teeth broke over a month ago" and "[he] filed 3 sick calls to dental about it, but [he] get[s] no answer." [Id. at 31]. Plaintiff appealed this grievance to Step Three wherein it was concluded and Plaintiff was advised as follows:

> On this record, it appears that dental staff have seen and treated this offender within the parameters of the Health Care Policy. According to Dental, you were seen in the dental clinic on 10/3/18 for a broken upper partial. Doctor Abreu recommended to you to have your remaining four maxillary teeth extracted so that a full denture could be made. You refused the recommendations for extractions and an upper denture. You also refused to have an impression made for a partial repair. The partial had to be sent to the lab in broken pieces with no new impression to help the lab repair it correctly. You appear to be deliberately refusing to assist with ANY

---

[5] It appears that Plaintiff is referring to a grievance he submitted on September 17, 2018 wherein he references a "grievance" he sent to Defendant Lassiter "several months ago about getting [his] teeth fixed." [Doc. 16-1 at 36]. This September 17, 2018 grievance was rejected because Plaintiff had an active grievance already in process, [Id. at 38], namely the September 7, 2018 grievance discussed below.

> recommendation. Dental also notes that this is the SIXTH repair of this partial.
>
> The disagreement of the offender with that of trained dental professionals does not render the professionals' judgment incompetent nor does it signify any indifference to inmates' care. Custody officials must rely on the qualified judgment of medical and dental professionals charged with inmate healthcare. The offender is encouraged to continue to submit sick calls and attend medical and or dental appointments to inform staff of any ongoing concerns or changes in his medical or dental condition.

[Id. at 41].

On October 16, 2018, Plaintiff filed a ten-page grievance regarding his dental care, which is largely in keeping with the allegations of his complaint in this matter. [See id. at 42-51]. Plaintiff again appealed this grievance to Step Three, where it was determined that "staff has taken appropriate action in response to [Plaintiff's] dental concerns." [Id. at 55].

Plaintiff alleges that "N.C. prison dentistry is outdated as a matter of policy, which of course is deliberate indifference," and that "policy overrules medical considerations." [Id. at 13-14 (emphasis in original)]. Plaintiff also alleges that "policymaking defendants deny root canals, caps or crowns, bridges, and implants because of cost" and that such denial "is deliberate indifference." [Id. at 14-15]. Plaintiff specifically takes issue with Policy No. TX V-6, Section II(C)(3)(b), which provides that new full or partial dentures

13

will be allowed only once during a five-year period, "except under extenuating circumstances and with approval of the Dental Director." [Doc. 16 at 25; Doc. 16-1 at 2]. Plaintiff, however, does not forecast evidence regarding how he was adversely impacted by this policy, other than by his own decision to refuse full upper dentures for fear of them breaking. [See id.]. Plaintiff also takes issue with the policy that precludes him, as a medium custody prisoner, from access to outside care providers at his own expense, calling this policy "punishment." [Doc. 16-1 at 4]. Plaintiff claims that, "if [he] could go to a good dentist in Asheville, [he] could have [his] teeth restored with crowns, bridges, and implants." [Id. at 14].

Plaintiff alleges that Defendant Smith was the NCDPS Medical Director and that, as Medical Director, she approved dental policies denying most forms of dental treatment, and is, therefore, "clearly responsible" for them. [Id. at 17]. Plaintiff also references the "long letter" he wrote to Dr. Smith in March 2018 "citing and challenging policies." [Id. at 18]. Plaintiff alleges that Defendant Dora Plummer "may have replaced Paula Smith" as Medical Director, but he makes no further allegations against Defendant Plummer. [Id. at 6].

As to Defendant Clare, Plaintiff alleges that Dr. Clare was the NCDPS Dental Director and that Dr. Clare "refused to solve [Plaintiff's] problem due

to his deliberate indifference." [Doc. 16 at 18].  Plaintiff alleges that pursuant to policy, Dr. Clare is "responsible for his policies which [deny] all NC prisoners caps or crowns, bridges, implants, and other ways to save or replace teeth," and that Dr. Clare is responsible for the alleged delay in access to dental care in the prisons.  [Id. at 19].  Plaintiff also purports to "challenge all dental policies that restrict or deny any 'community standard' treatment available today in 2019 and the future."  [Id.].

As to Defendant Woodruff, Plaintiff alleges that she was the NCDPS Assistant Dental Director and that she responded to Plaintiff's March 2018 letter to Defendant Smith.  [Id. at 20].  Plaintiff claims Dr. Woodruff "refused to discuss anything in [his] letter" and "only sent [him] a form letter" indicating that Plaintiff was receiving "active dental care" and advising Plaintiff to "continue to follow-up with [his] unit dentist."  [Id.].  Finally, Plaintiff claims that Dr. Woodruff "enforces policies that prevent dentists from saving or replacing [his] teeth."  [Id.].

As to Defendant Hooks, Plaintiff alleges that, as Secretary of Public Safety, pursuant to N.C. Gen. Stat. § 148-11, Hooks "is legally responsible for all prison rules and policies by law, not by respondeat superior." [Doc. 16 at 16].  Further, because Hooks "'adopted' rules and policies in effect before he took the job, he approves them."  [Id.].  Plaintiff, however, concedes that

15

Defendant Hooks did not "[have] actual knowledge of [Plaintiff's] dental problems." [Id. at 20].

## B.   Defendants' Forecast of Evidence

The evidentiary forecast before the Court demonstrates the absence of a genuine issue of material fact on Plaintiff's claims.  Defendants' forecast consists of the Declarations of Defendants Abreu-Pena, Rickman, Clare, Townsend, Smith, and Plummer; Plaintiff's prison dental records from November 10, 2015 through October 10, 2019; Plaintiff's Sick Call Appointment Requests from August 18, 2015 to September 24, 2019;[6] and certain prison dental policies.

### 1.    Defendants Townsend, Rickman, and Abreu-Pena

Defendants' evidence tends to show the following.   Defendant Townsend is a dentist who has been licensed to practice dentistry since 1978.  [Doc. 90 at ¶ 2: Townsend Declaration].  Dr. Townsend began working

---

[6] Plaintiff's materials also included six purported Sick Call Appointment Requests.  [See Docs. 16-1 at 11, 13, 14, 35, 56, 58].  Two of these Requests [Docs. 16-1 at 13, 35] do not appear anywhere in Plaintiff's complete dental records for the relevant period, as submitted by Defendant Clare [see Doc. 83-1 at 2-117], and none of these Requests reflect having been filed or triaged.  There is some question as to whether Plaintiff created at least some of these Requests after the fact in an attempt to bolster his claims.  [See Doc. 90 at ¶¶ 21-23].  Complete versions of four of these Requests, which reflect having been triaged and processed by prison staff, are included in Plaintiff's dental records submitted by Defendants Clare and Townsend.  The remaining two Appointment Requests submitted by Plaintiff, from February 15, 2017 and September 28, 2018, if valid, simply reflect additional complaints by Plaintiff regarding his teeth and do not impact the Court's ruling in this case.  [See Doc. 16-1 at 13, 35].

16

for the Dental Division of the NCDPS in September 2014 at Alexander. [Id. at ¶ 3]. In January 2015, Dr. Townsend transferred to Mountain View. [Id.]. In Dr. Townsend's 42-year dental career, he has never had a Board complaint or lawsuit, except the pending action, and has never had his license restricted, suspended, revoked or under any state of probation. [Id. at ¶ 4]. All of Dr. Townsend's treatment of Plaintiff occurred at Mountain View. [Id. at ¶ 6]. Drs. Rickman and Abreu-Pena are also dentists employed by the NCDPS. [Doc. 81 at ¶ 1: Abreu-Pena Declaration; Doc. 82 at ¶ 1: Rickman Declaration]. Dr. Abreu-Pena provided dental treatment to Plaintiff while he was housed at Alexander, [Doc. 81 at ¶ 3], while Dr. Rickman provided care to Plaintiff at Mountain View and Alexander, [see Doc. 82 at ¶¶ 4, 9].

For an inmate to get a dental clinic appointment without a regularly scheduled follow-up appointment, an inmate submits a Sick Call Appointment Request ("Appointment Request") describing his complaint. [Doc. 90 at ¶ 7]. Each complaint is reviewed by a dental assistant who schedules a time for the inmate to see a dentist, if appropriate. [Id.]. An inmate is not seen by a dentist unless such an appointment is scheduled. [Id.]. Further, usually only the issue in the referral is treated at that appointment. [Id.]. Schedules are posted in advance and are readily

17

accessible to inmates.  [Id.].  If an inmate fails to show up for an appointment, it normally takes three to six weeks to reschedule it.  [Id.].  NCDPS dentists are not involved in the creation of or revisions to the NCDPS Sick Call Policy. They do not place inmates on the Sick Call Appointment waiting list or ensure that inmates are scheduled for appointments with dentists.  [See id. at ¶ 7].

On November 2, 2015, Plaintiff completed an Appointment Request complaining that "[his] partial [denture] broke."  [Doc. 90-1 at 4].  Dr. Townsend first treated Plaintiff on November 10, 2015 at Mountain View for planned fillings of teeth #8 (upper right front) and #11 (upper left canine) and an impression to repair Plaintiff's broken upper partial denture. [Doc. 90 at ¶ 8].  At this time, Plaintiff's upper arch consisted of teeth #3 (upper first molar), #5 (upper right first bicuspid), #8, and #11, all of which had been previously restored with either a crown or fillings.  Plaintiff's lower arch consisted of most of his front teeth and tooth #18 (lower second molar).  Dr. Townsend saw Plaintiff on November 30, 2015 to deliver the repaired upper partial denture, when Plaintiff reported that it "looks, feels good."  [Id. at ¶ 8].

On January 9, 2016, Plaintiff completed an Appointment Request complaining that the "partial plate" he received "5 weeks ago broke already." [Doc. 90-1 at 15].  Plaintiff was seen a few days later by Dr. Rickman in response to this Appointment Request.  [Id. at 17].  At this visit, Dr. Rickman

noted that Plaintiff "fractured #6/7 off partial again" and requested that the partial be repaired again with the "addition of metal reinforcement if possible." [Id.]. Plaintiff's partial denture was repaired, and Plaintiff was seen by Dr. Rickman on February 9, 2016 for a fitting and its delivery to Plaintiff. [Doc. 90-1 at 20; Doc. 82 at ¶¶ 4-5].

On May 28, 2016, Plaintiff completed another Appointment Request complaining that "[his] partial plate broke again. It keeps happening." [Doc. 90-1 at 22]. Plaintiff was seen a few days later, on June 1, 2016, by Dr. Townsend. [Id. at 23]. Dr. Townsend ordered that Plaintiff's upper partial denture be sent for repairs again because the #6, #7 flange had fractured off. [Doc. 90 at ¶ 10; Doc. 90-1 at 23]. Dr. Rickman adjusted the repaired upper partial denture and delivered it to Plaintiff on June 21, 2016. [Id.; Doc. 82 at ¶ 6; Doc. 90-1 at 26].

On December 2, 2016, Plaintiff completed another Appointment Request, complaining that "[his] back lower molar broke, and the large filling fell out. It is painful and may have to be removed." [Doc. 90-1 at 28]. On December 6, 2016, Plaintiff was seen by Dr. McAdoo, an African American dentist, in response to this complaint.[7] Dr. McAdoo diagnosed Plaintiff's

_____

[7] Contrary to Plaintiff's allegations, the documents reflect that Dr. Townsend did not see Plaintiff in December 2016. [Doc. 90 at ¶ 11]. Furthermore, Dr. Townsend denies that he refused to repair Plaintiff's tooth #11, that he told Plaintiff he would consider pulling

tooth #18 as "non restorable with large carious lesion, irreversible pulpitis." [Id. at 29]. Dr. McAdoo recommended that tooth #18 be extracted. Plaintiff agreed to schedule this procedure and was "pleased with his treatment." [Id.]. The extraction was scheduled for January 11, 2017 at 8:10 a.m., but Plaintiff failed to show up for the appointment. [Doc. 90 at ¶ 11; Doc. 90-1 at 32]. On the same day, Plaintiff filed an Appointment Request, complaining that "[his] tooth broke and hurts" and that "[he] filed a sick call about 6 weeks ago, but [he is] still in pain." [Doc. 90-1 at 31]. Plaintiff then asks, "When can I get the tooth repaired or pulled?" [Id.].

Dr. Townsend saw Plaintiff on January 18, 2017 in response to Plaintiff's January 11, 2017 Sick Call Request. [Doc. 90 at ¶ 12]. Dr. Townsend noted that Plaintiff missed his last appointment and that x-rays showed that tooth #18 is abscessed and non-restorable. [Doc. 90-1 at 33]. Dr. Townsend ordered that Plaintiff be put on the schedule for extraction. [Id.]. Dr. Townsend performed the extraction on February 22, 2017. [Id. 39]. On February 27, 2017, Plaintiff completed another Appointment Request,

_____

out all of his top teeth and request a full top denture, or that he told Plaintiff it would take a year to get a denture. [Id.]. Dr. Townsend also denies telling Plaintiff in December 2016 or otherwise that Plaintiff, "you will figure something out," in relation to Plaintiff chewing without top teeth. [Id.]. These differences, however, do not raise genuine issues of material fact because the records are clear as to what treatment the Plaintiff actually received, as explained herein.

complaining that the stitch was coming out of the extraction site and that "the hole [was] very painful." [Id. at 43]. Plaintiff was seen the next day by another dentist, Dr. Thomas Donnelly, who diagnosed Plaintiff with dry socket, a known complication of tooth extraction, and treated Plaintiff. [Doc. 90 at ¶ 12; Doc. 90-1 at 44]. Plaintiff was seen the next day in follow up by Dr. Townsend. Plaintiff's dry socket resolved without further complication. [Id.; Doc. 90-1 at 46].

On March 14, 2017, Plaintiff completed another Appointment Request, complaining that his "left canine" felt chipped or broken. [Doc. 90-1 at 48]. Dr. Townsend saw Plaintiff on March 21, 2017 for this complaint and determined that Plaintiff had lost part of the filling on tooth #11. [Doc. 90 at ¶ 13; Doc. 90-1 at 50]. Dr. Townsend ordered that restoration of Plaintiff's tooth be scheduled. [Id.]. Dr. Donnelly repaired tooth #11 on March 28, 2017 and told Plaintiff that the tooth had a guarded prognosis. [Doc. 90-1 at 52].

On June 3, 2017, Plaintiff completed another Appointment Request, again complaining that his partial denture was broken. [Id. at 55]. Dr. Townsend saw Plaintiff on June 14, 2017 for this complaint. [Doc. 90 at ¶ 14]. Dr. Townsend noted that #9 and #10 were broken off the partial denture and sent it to the lab to be repaired. [Id.; Doc. 90-1 at 57]. On July 9, 2017, before Plaintiff's partial denture was returned, Plaintiff completed another

Sick Call Appointment Request, complaining that the filling put "in [his] upper canine recently fell out already." [Doc. 90-1 at 60].

On July 13, 2017, Dr. Rickman saw Plaintiff for fitting and return of Plaintiff's partial denture and for Plaintiff's complaint regarding his lost filling in tooth #11. [Id. at 61]. Examination by Dr. Rickman showed "very deep, recurrent decay" and a "beginning abscess." [Id.; Doc. 82 at ¶ 7]. Dr. Rickman felt that this tooth was not restorable and recommended to Plaintiff that it be extracted. [Doc. 82 at ¶ 7]. Dr. Rickman's notes from this visit state, in part, as follows:

> Distressed [patient] as he states this is only tooth that holds in the partial. Advised on need for full exam and radiographs and consider full Max denture if unable to wear partial with existing teeth, which is most likely. [Patient] states strong gag reflex and need for partial as palate is only partially covered. Readvised of [diagnosis] of abscess #11 and treatment recommendation of removal, not filling. Readvised need for full exam and radiographs to generate [treatment] plan. [Patient] seemed resistive. Advised alternative to [extraction] would be do nothing, [patient] does not qualify for [endodontics][8] due to large amount of tooth missing.

[Doc. 90-1 at 61; see Doc. 90 at ¶ 15]. The treatment plan recommended by Dr. Rickman was appropriate in all respects and would have appropriately addressed Plaintiff's dental conditions. [Doc. 82 at ¶ 7]. Plaintiff told Dr.

---

[8] Endodontics means root canal treatment. [Doc. 90 at ¶ 15].

Rickman he would think about the treatment plan and follow-up with a sick call request as needed.  [Id.].

On July 30, 2017, after having been told that tooth #11 needed to be extracted, Plaintiff completed another Appointment Request, complaining "about the hole in [his] tooth."  [Doc. 90-1 at 63; Doc. 90 at ¶ 16].  Plaintiff stated, "I hate to leave the hole, but need the tooth to hold my partial plate."  [Id.].  Dr. Townsend saw Plaintiff on August 8, 2017 for this complaint.  [Doc. 90 at ¶ 16; Doc. 90-1 at 65-66].  Plaintiff wanted tooth #11 to be filled, if possible.  Dr. Townsend explained to Plaintiff that retention of tooth #11 was not possible under the circumstances, that tooth #11 would no longer support an upper partial denture, and recommended extraction of his remaining upper teeth and a full upper denture.  [Id.; Doc. 90-1 at 66].  Plaintiff "did not want to do anything until [the] tooth [was] causing him more trouble."  [Doc. 90-1 at 66; see Doc. 90 at ¶ 16].

On February 14, 2018, Plaintiff completed another Appointment Request, complaining that his "partial plate broke again."  [Doc. 90-1 at 67].  Dr. Townsend saw the Plaintiff on February 21, 2018 for this complaint and sent the partial to the lab for repair.  [Doc. 90 at ¶ 17; Doc. 90-1 at 69].  Dr. Townsend saw Plaintiff for the last time on March 14, 2018 to fit and return

Plaintiff's repaired partial denture to him. [Id.; Doc. 90-1 at 72]. Thereafter, Plaintiff was transferred to Alexander. [See Doc. 82 at ¶ 9].

On June 22, 2018, now at Alexander, Plaintiff completed another Appointment Request, complaining that "[his] canine broke" and asking, "can you save it[?]." [Doc. 90-1 at 74]. Dr. Rickman saw Plaintiff on August 1, 2018, although it is unclear whether this visit was in response to this appointment request. [See Doc. 90-1 at 76; Doc. 82 at ¶ 9]. Dr. Rickman's notes from this visit provide, in part, as follows:

> [Patient] presented for consult concerning treatment…. [Patient] states desire to have something placed in hole – points to #11 – so things "won't go up in there" and that this tooth still helps hold his partial, which has #'s 6/7 fractured but not completely off. Advised #11 was not restorable by any method – tooth is off at gum line and everything is soft and not viable as tooth structure. [Patient] asks if implant could be done on this area to help hold up a partial or if implants could be placed throughout. Advised that on street that these may be options, but is Medium Custody and not eligible for treatment due to custody level. Discussed his Dental needs until [patient] stated he had to relieve himself and [patient] dismissed from clinic. Advised if he want to have partial repaired to let Dental know.

[Doc. 90-1 at 76-77]. DPS policy did not authorize a dental implant because the treatment option Dr. Rickman offered Plaintiff was "viable and appropriate." A dental implant was not medically necessary. [Doc. 82 at ¶ 9]. Furthermore, even if a dental implant might be an option outside of the

24

penal system, Plaintiff was not eligible for treatment by an outside dentist (even at his own expense) because of Plaintiff's custody status. [Doc. 82 at ¶ 9]. Dr. Rickman had no further interactions with Plaintiff after this August 1, 2018 visit. [Id. at ¶ 10].

On August 17, 2018, Plaintiff completed another Appointment Request, complaining again that his "partial plate broke!" [Doc. 90-1 at 78]. This Request was triaged on August 20, 2018 and Plaintiff was placed on the waiting list. [Id. at 79]. Plaintiff proceeded to file additional requests related to this complaint on September 1, 2018; September 7, 2018; and September 28, 2018, despite being on the waiting list for treatment the entire time. [Id. at 80, 81-84; Doc. 81 at ¶ 4]. Plaintiff was eventually seen on October 3, 2018 by Dr. Abreu-Pena for this complaint. [See Doc. 90-1 at 85]. Dr. Abreu-Pena's notes from this visit provide, in part, as follows:

> [Patient] presents to clinic for broken upper partial. Is broken again # 6-7 teeth part of the acrylic partial, broke the metal piece. Recommended full maxillary denture but [patient] refused. The actual partial has only a clasp on # 5. For that reason always is broken on acrylic #6-7. # 11 is retained root recommended extraction. [Patient] refused to take alginate impression to repair the partial. Send to the lab if they can reinforce the metal or replace it. He refuse[d] a complete upper denture and refuse[d] alginate impression.

[Doc. 90-1 at 85 (emphasis added)]. Plaintiff's broken upper denture was sent to the lab on or about October 3, 2020, with instructions by Dr. Abreu-Pena to "[p]lease repair upper partial reinforce the metal or [ ] a new one, if is possible." [Doc. 90-1 at 91]. This was the sixth repair of Plaintiff's partial upper denture. [Doc. 90 at ¶ 18]. The treatment Dr. Abreu-Pena recommended and offered Plaintiff was appropriate in all respects and would have addressed Plaintiff's dental condition. [Doc. 81 at ¶ 5]. Plaintiff, however, refused this treatment. [Doc. 90-1 at 85].

Plaintiff filed his original Complaint in this matter on November 13, 2018. [Doc. 1]. It was signed and dated November 3, 2018. [See Doc. 1 at 5]. On November 5, 2018, Plaintiff filed an Appointment Request, complaining that Dr. Abreu-Pena "took [his] partial plate a month ago to send to Raleigh for repair" and that he had not gotten it back yet. [Doc. 90-1 at 92]. This Request was triaged the next day and it was noted, "We received his partial a week or two ago, but not able to deliver to him yet due to the grievance letter he submitted. Waiting on DDS to complete grievance process first." [Id. at 93].

Dr. Abreu-Pena saw Plaintiff on November 15, 2018 to fit and return Plaintiff's partial denture. [Id. at 94]. At this visit, Dr. Abreu-Pena wrote the following note regarding Plaintiff's care:

> I explained to [patient] the best treatment we can do here is a full maxillary extraction with a complete upper denture. Explain ext/impression/denture process. He said: "I don't want to do it" in reference to take impressions for the full denture because he has a bad gag reflex. [Patient] refuse[s] and wants to stay with the partial. He discussed about putting in a law suit assuming we're neglecting the dental [treatment] he requested. He believes the best [treatment] for him is implants and bridges. [Patient] said that he has a crown (Tooth # 3) that cost him a lot of money and refuse[s] [extraction]. He discussed … getting # 11 [root canal treatment] and place permanent/temporary crown. Informed [patient] tooth # 11 is not restorable due to it broken down by the gum line. [Patient] disagrees and wants to keep tooth, hoping to have it restore[d].

[Id. at 94]. The dental implants and bridges requested by Plaintiff "were not medically necessary and therefore were not authorized under the DPS policy and procedure manual." [Doc. 81 at ¶ 6].

On February 21, 2019, Plaintiff filed another Appointment Request, complaining about a broken incisor. [Doc. 90-1 at 96]. This Request was triaged on February 25, 2019, and Plaintiff was placed on the waiting list for treatment. [Id. at 97]. Plaintiff filed additional Requests on March 17, 2019; March 27, 2019; April 10, 2019; and on April 18, 2019; despite being on the waiting list the entire time for this complaint. [Doc. 81 at ¶ 7].

Dr. Abreu-Pena saw Plaintiff on April 23, 2019. At this visit, Plaintiff's broken tooth #8 and abscessed tooth #11 were treated. Dr. Abreu-Pena

"explained again the best treatment is full maxillary denture with full extractions." [Doc. 90-1 at 105]. Plaintiff again refused to do impressions because of his bad gag reflex. [Id.]. Plaintiff refused to consent to full extractions, but finally agreed to extract tooth #11 because of the abscess. [Id.]. Plaintiff also insisted of having tooth #8 filled despite Dr. Abreu-Pena's advice that there was not enough tooth structure and that a filling of tooth #8 would likely fail and break again if Plaintiff bites hard food. [Id.; Doc. 81 at ¶ 8]. Plaintiff advised that he wanted to keep "#8, 3, and 5 for at least 3 more years," which "is the time for his law suit." [Doc. 90-1 at 105]. Dr. Abreu-Pena removed decay from and filled tooth #8. [Id. at 106]. She also scheduled the extraction of tooth #11, which she performed on April 30, 2019. [Id. at 106, 109]. Plaintiff again agreed only to a partial upper denture at this time. [Id. at 109]. This is Dr. Abreu-Pena's last visit with Plaintiff reported in the record.

On September 24, 2019, Plaintiff filed a Sick Call Appointment Request, complaining that, "Dr. Abreu said she would have a tooth added to [his] partial when [his] gums healed from the extraction of [his] canine tooth." Plaintiff claims that he "was being denied dental treatment again."[9] [Doc. 90-

_____

[9] There are no records between the extraction performed by Dr. Abreu-Pena on April 30, 2019 and this Request suggesting that Plaintiff had previously requested, and/or been denied, this care.

1 at 113].  Plaintiff was seen by Dr. Edward Erkes on October 10, 2019 for this complaint.  [Id. at 115].  Dr. Erkes noted that Plaintiff wanted a tooth added to his upper partial denture to replace tooth #11.  Dr. Erkes also noted that, "[patient] has been told that he needs a full upper denture, but he refuses that treatment at this time – just wants his partial denture repaired."  [Id.].  Dr. Erkes, therefore, did impressions to add tooth #11 to Plaintiff's partial upper denture.  Plaintiff was directed to return to care for delivery of the partial denture.  [Id.].  There are no further records related to Plaintiff's dental care in the record in this matter.

In addition to refusing the care recommended by Drs. Townsend, Rickman, and Abreu-Pena, Plaintiff also refused to schedule recommended teeth cleanings, although inmates are charged only $5 for such cleanings, from at least November 2015 through March 2018 and "for years prior" to this time.  [Doc. 90 at ¶ 19].

## 2.    The "Policymaker" Defendants[10]

Defendant Paula Smith is a medical doctor and the was the Director of Health Services for the NCDPS from March 2001 until January 2018, when

---

[10] In addition to Defendants Smith, Clare, Woodruff, and Plummer, the Court includes Defendants Hooks and Lassiter within this designation. Plaintiff's claim against Hooks is based entirely on Hooks' alleged adoption of the disputed policies in his position as Secretary of the NCDPS, while Plaintiff's claim against Lassiter is based on Lassiter's alleged failure to change medical and dental policies. [See Doc. 16 at 15].

she retired.  [Doc. 93-1 at ¶¶ 2, 11].  At the times relevant to this matter, Dr. Smith was not responsible for Dental Services in the NCDPS.  Any complaints or calls received in her office regarding dental services would have been directed to Defendant James Clare, the NCDPS Dental Director during the relevant times.  [Id. at ¶ 13].  While Dr. Smith did draft the Health Services Policy and Procedure and the Dental Services Policy and Procedure, she relied heavily on the Dental Director and his staff in so doing.  [Id. at ¶¶ 14-15].  These policies had to provide procedures for providing healthcare to many inmates, given the constraints of custodial and safety concerns and the limited resources of staff.  [Id. at ¶ 15].  Because of the number of inmates and the somewhat limited resources of staff and dental care providers, some limitations are reasonable and necessary.  [Id. at ¶ 16].  For instance, Policy No. TX V-6, Section II.C.3(b) of the Health Services Policy and Procedure Manual balances these interests.  That policy provides, "Full dentures and partial dentures will be allowed only once in a five[-]year period except under extenuating circumstances and with approval of the Dental Director."  [Id.].  As such, while the policy reasonably limits access to full and partial dentures, allowance is made for extenuating circumstances.  [Id.].

Another such limitation is found in Policy No. TX I-4. It provides that an inmate may obtain medical or dental services outside of the NCDPS at his or her own expense if certain conditions are met, including that the "applicant must be in minimum custody." [Id. at ¶ 17; Doc. 83 at ¶ 5: Clare Declaration; Doc. 83-3 at ¶ 2]. This policy is born of custodial and safety concerns. Namely, the NCDPS has determined that any prisoner who is not a minimum custody prisoner poses an unacceptable custodial or safety risk to the public or staff. [Id. at ¶ 17]. Because Plaintiff is a medium custody inmate, he is not eligible to receive medical or dental treatment outside of the prison system, even at his own expense. [Doc. 83 at ¶ 5].

Dr. Smith attests, with her more than 20 years of NCDPS experience, that NCDPS Policy and Procedure for the provision of healthcare during her time as Medical Director was adequate to provide healthcare to inmates in accordance with the community standard of care. [Doc. 93-1 at ¶ 19].

Contrary to Plaintiff's allegations, Dora Plummer was not Dr. Smith's successor as Medical Director, but rather a registered nurse who was employed by the NCDPS from March 2017 until late 2018, when she retired. [Doc. 93-1 at ¶ 21; Doc. 93-2 at ¶ 7: Plummer Declaration]. Defendant Plummer was a Communications Coordinator/Family Liaison for Health Services for the entire NCDPS. [Doc. 93-2 at ¶ 6]. Her responsibilities in

this position included, among other things, responding to written correspondence regarding healthcare concerns and addressed issues therein as appropriate. [Id. at ¶ 8]. Defendant Plummer did not provide medical services to Plaintiff. [Id. at ¶ 10].

Defendant James Clare is the NCDPS Dental Director. [Doc. 83 at ¶ 1]. The Dental Services Policy and Procedure, pursuant to which dental care and treatment are provided to NCDPS inmates, is promulgated by the NCDPS, not by Dr. Clare or Defendant Donna Woodruff, the Assistant Dental Director. [Id. at ¶ 4]. Dr. Clare attests, according to Plaintiff's dental record, Plaintiff has, at all times, been offered medically necessary and appropriate dental treatment, including, but not limited to, restorations (fillings), extractions, and partial and full dentures. [Id. at ¶ 6]. Furthermore, the dental procedures that were offered to Plaintiff are routinely used in patients who are not incarcerated. [Id.]. Plaintiff, however, demanded that he be provided more extensive dental procedures, such as endodontics, crowns, bridges, and dental implants that were not medically necessary and, therefore, not authorized under the NCDPS Dental Services Policy and Procedure Manual. [Id.].

Neither Defendant Hooks nor Defendant Lassiter were involved in the day-to-day provision of healthcare or in the formulation of procedure for the

provision of healthcare. [Doc. 93-1 at ¶ 18]. Dr. Smith attests that she was not aware of any pervasive problems in the provision of healthcare to inmates that would have required the intervention of either Defendant Hooks or Defendant Lassiter. [Id. at ¶ 20].

This matter is now ripe for disposition.

## IV. DISCUSSION

Claims under 42 U.S.C. § 1983 based on an alleged lack of or inappropriate medical treatment fall within the Eighth Amendment's prohibition against cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97, 104 (1976). To state a claim under the Eighth Amendment, a plaintiff must show a "deliberate indifference to serious medical needs" of the inmate. Id. "Deliberate indifference requires a showing that the defendants actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care." Young v. City of Mt. Ranier, 238 F.3d 567, 575-76 (4th Cir. 2001) (citations omitted). "To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990).

Evidence that might be sufficient to support negligence and medical malpractice claims do not, without more, rise to the level of a cognizable Section 1983 claim. Estelle, 429 U.S. at 106; Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it."). "[E]ven if a prison doctor is mistaken or negligent in his diagnosis or treatment, no constitutional issue is raised absent evidence of abuse, intentional mistreatment, or denial of medical attention." Stokes v. Hurdle, 393 F. Supp. 757, 762 (D. Md. 1975), aff'd, 535 F.2d 1250 (4th Cir. 1976). Further, the constitutional right is to medical care. No right exists to the type or scope of care desired by the individual prisoner. Id. at 763. Therefore, a disagreement "between an inmate and a physician over the inmate's proper medical care [does] not state a § 1983 claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) (dismissing the plaintiff's § 1983 claim against a defendant physician for allegedly discharging the plaintiff too early from a medical clinic, as such claim did not rise to the level of deliberate indifference but would, "at most, constitute a claim of medical malpractice").

To be found liable under the Eighth Amendment, a prison official must know of and consciously or intentionally disregard "an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 837 (1994);

Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir. 1998). Farmer, 511 U.S. 825, 837 (1994). A prison official, however, is not liable if he knew the underlying facts but believed, even if unsoundly, that the risk to which the facts gave rise was insubstantial or nonexistent. Farmer, 511 U.S. at 837.

## A. Defendants Townsend, Rickman, and Abreu-Pena

To succeed on a claim against Defendants Townsend, Rickman, and Abreu-Pena under the Eighth Amendment, Plaintiff must show a deliberate indifference to Plaintiff's serious medical needs. Estelle, 429 U.S. at 104. To establish such indifference, the "treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscious or to be intolerable to fundamental fairness." Miltier, 896 F.2d at 851. Absent exceptional circumstances, a disagreement between a prisoner and a health care provider over the prisoner's proper care is not grounds for a § 1983 claim. Wright, 766 F.2d at 849.

Here, the forecast of evidence shows, at best, a disagreement between Defendants Townsend, Rickman, and Abreu-Pena and the Plaintiff regarding the appropriate dental care for Plaintiff's dental conditions.[11] See Wright, 766

---

[11] It is worth noting that, in addition to having possibly fabricating certain Sick Call Appointment Request, Plaintiff's allegations are wrought with mischaracterizations and misstatements of Plaintiff's dental care, as evidenced by Plaintiff's dental record. For instance, Plaintiff alleges that in December 2016 Plaintiff saw Dr. Townsend and Dr. Townsend refused to fill or repair Plaintiff's upper canine when Plaintiff's filling fell out. [Doc. 16-1 at 3]. Plaintiff, however, was not seen by Dr. Townsend in December 2016,

F.2d at 849.  Namely, the forecast of evidence shows that these Defendants fully addressed Plaintiff's dental needs and that Plaintiff simply wanted these Defendants to prescribe and provide different treatment than he received. Specifically, Plaintiff believed that he should have received dental implants, crowns, and bridges to restore and replace his (many) missing teeth. Three different dentists, however, recommended and would have ordered extraction of Plaintiff's few remaining upper teeth and full dentures, which was appropriate care for Plaintiff's clinical picture.  Plaintiff, however, repeatedly refused this care.

Plaintiff was seen 24 times by different dentists between November 2, 2015 and October 10, 2019.  Plaintiff continued to be seen and treated despite his refusal of recommended care, which could have preempted some of these visits and additional repairs of Plaintiff's partial upper denture.  In addition, Plaintiff declined to have his teeth cleaned for years before the treatment at issue here, where Plaintiff's conditions could very well have been prevented or mitigated had he not refused regular, basic dental care.

---

but rather by Dr. McAdoo.  Dr. McAdoo recommended extraction of Plaintiff's tooth #18, a procedure to which Plaintiff agreed but then failed to show up for.  Perhaps given the extensive dental care Plaintiff received between 2015 and 2019, Plaintiff simply misremembers certain events and did not intend to mislead the Court in this regard. Whatever the reason for the inconsistencies between certain allegations and Plaintiff's dental record, Plaintiff's forecast of evidence is insufficient to create a genuine issue of material fact in this case.

Plaintiff is simply not entitled to his most desired dental care at every level. He was provided (or at least repeatedly offered) medically necessary dental care. In short, the forecast of evidence has no tendency to support that any treating dentist Defendant acted with "deliberate indifference" to Plaintiff's serious dental needs. See Estelle, 429 U.S. at 194, 97 S. Ct. at 285; Overman v. Wang, 801 Fed. App'x 109, 111-12 (4th Cir. 2020) (affirming judgment on bench trial finding prison doctor's treatment of prisoner's knee injury was reasonable given the prisoner's symptoms despite failure to provide other, more advanced available treatment).

Furthermore, although the forecast of evidence tends to show that Plaintiff experienced some delays in receiving care in September 2018 and March and April of 2019, there is no forecast of evidence tending show that these delays were caused by any particular Defendant or Defendants or that any delays experienced by Defendant are constitutionally redressable, in any event.

In sum, the forecast of evidence on Plaintiff's claims against Defendant Townsend, Rickman, and Abreu-Pena is insufficient. Given every reasonable inference from the forecasted evidence, no reasonable jury could find in favor of the Plaintiff on a § 1983 claim under the Eighth Amendment such as Plaintiff has alleged. Summary judgment in favor of these

Defendants is, therefore, appropriate.

## B.    The "Policymaker" Defendants

Here, because Plaintiff received constitutionally adequate dental care, his § 1983 claims against the remaining Defendants also necessarily fail.[12] Furthermore, although Plaintiff disagrees with certain policies, he has not shown that they evince a deliberate indifference to serious medical (or dental) needs of prisoners in any event.  For example, Plaintiff takes issue with the policy that precludes him, as a medium custody prisoner, from access to outside care providers at his own expense.  Plaintiff ignores the plainly legitimate purpose for such a policy, as forecasted by Defendants. Namely, the NCDPS has determined that medium and maximum custody prisoners would pose an unacceptable custodial or safety risk to the public and/or to staff if they were to be seen by outside healthcare providers.  As such, Plaintiff's lack of access to the particular care he desires is the consequence of his custody status, which is based on legitimate policy, and not the result of any Defendants' deliberate indifference to Plaintiff's dental or medical needs.

_____

[12] As to Defendant Plummer, Plaintiff makes no allegations against her, other than she "may have replaced Paula Smith" as Medical Director.   [Doc. 16-1 at 6].   The uncontroverted evidence, however, demonstrates that Defendant Plummer was a registered nurse who was employed by the NCDPS but never served in the alleged capacity.  Defendant Plummer, therefore, will be dismissed as a Defendant in this matter.

38

To be sure, Plaintiff received medically necessary and appropriate dental care and cannot demand care in excess of what is allowed by legitimate policy. There is no forecast of evidence that any "policymaker" Defendant had the requisite state of mind to establish "deliberate indifference" under the law. Deliberate indifference describes a state of mind more blameworthy than negligence, requiring (1) that a defendant have been personally aware of facts from which the inference could be drawn that Plaintiff would suffer a substantial risk of serious harm; and (2) that the defendant had actually drawn the inference and recognized the existence of such a risk. Farmer, 511 U.S. 825, 837 (1994). Further, a prison official is not liable if he knew the underlying facts but believed, even if unsoundly, that the risk to which the facts gave rise was insubstantial or nonexistent. Id. at 837.

Here, the forecast of evidence in this case fails to satisfy these elements as to any "policymaker" Defendant's state of mind. The forecast of evidence does not show that Defendants Smith, Clare, and Hooks had any knowledge of Plaintiff's care or any facts from which they could have drawn an inference of substantial attendant risk therefrom. See Gordon v. Schilling, 937 F.3d 348, 357 (2019) ("The subjective component is satisfied by proof

of a defendant's deliberate indifference.") (citation omitted).

Defendant Woodruff was aware of some of Plaintiff's complaints, having responded to Plaintiff's April 30, 2018 letter to Dr. Smith, but there is no forecast of evidence that she was aware of facts from which she could have inferred a substantial risk of serious harm to Plaintiff. See Farmer, 511 U.S. at 837. To the contrary, Dr. Woodruff, in responding to Plaintiff's letter, investigated Plaintiff's care, and satisfied herself that Plaintiff was being offered "reasonable treatment." [Doc. 16-1 at 23].

Finally, as to Defendant Lassiter, Plaintiff alleges that he sent Lassiter a "grievance" in May 2018, complaining that "the dentist here was to pull all [his] top teeth – even a good crown – and order a full top denture, which takes about a year to get" and about various prison dental policies, including the policy precluding outside services for medium and maximum custody prisoners and the policy allowing full or partial dentures once every five years. [Doc. 16-1 at 24]. Even giving Plaintiff the benefit of a very generous inference that Defendant Lassiter received this letter, and that he, therefore, had actual knowledge of Plaintiff's complaints therein, there remains no forecast of evidence showing that Defendant Lassiter had a deliberately indifferent state of mind. Namely, Plaintiff's letter to Lassiter did not present facts from which Lassiter could have inferred that Plaintiff would suffer

substantial risk of serious harm.  Rather, the letter reflected that "the dentist" was offering reasonable care in accordance with prison dental policy with which Plaintiff disagreed.  As such, there was no risk of serious harm Defendant Lassiter should or could have inferred.  See Farmer, 511 U.S. at 837.

As such, Plaintiff has also failed to raise a genuine issue of material fact as to Defendants Smith, Clare, Woodruff, Plummer, Hooks, and Lassiter. Summary judgment for all Defendants is, therefore, appropriate.

## IV. CONCLUSION

In sum, for the reasons stated herein, the Court grants summary judgment for all Defendants.

**IT IS, THEREFORE, ORDERED** that Plaintiff's Motion for Summary Judgment [Doc. 74] is **DENIED**; Defendants' Motions for Summary Judgment [Docs. 80, 88, 91] are **GRANTED**; and this action is dismissed with prejudice.

The Clerk is respectfully instructed to substitute the true full name of Defendant FNU Townsend as Defendant Tim F. Townsend in the docket in this matter and to correct the spelling of Defendant Claire to Clare.

The Clerk is respectfully instructed to terminate this action.

**IT IS SO ORDERED**.

Signed: September 22, 2020

Martin Reidinger
Chief United States District Judge